JODI LINKER
Federal Public Defender
Northern District of California
SAMANTHA JAFFE
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Telephone:   (510) 637-3500
Facsimile:   (510) 637-3507
Email:         Samantha_Jaffe@fd.org

Counsel for Defendant Garcia Lopez

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JOSE GARCIA LOPEZ,<br><br>Defendant. | **Case No.:** CR 23–081 JST<br><br>**SENTENCING MEMORANDUM**<br><br>**Court:**            Courtroom 6, 2nd Floor<br>**Hearing Date:**   May 31, 2024<br>**Hearing Time:**   9:30 a.m. |

## INTRODUCTION

Jose Garcia Lopez is twenty-two years old. He has no criminal history. He made a series of horrible, life-changing mistakes that led to this case, yes. But he is still twenty-two years old, and because of his immigration status, these choices will forever alter the trajectory of his life. Because of his youth, and the possibility of being separated from his family and facing violence in Mexico, the defense's request today is for a split sentence: it is Mr. Garcia Lopez's only chance, no matter how slim, to avoid deportation. If he is released from custody to home confinement, he will, most likely, be placed on a non-detained immigration docket. This will give him easier access to immigration counsel and the ability to attend hearings from out of custody, all of which results in less coercive circumstances, less likelihood of accepting deportation for the sheer fact of being released from

1    custody, and a shred of a chance at immigration relief.

2         If Mr. Garcia Lopez goes directly from federal custody to immigration detention, he will

3    certainly be placed in deportation proceedings immediately. Every incentive will cut in favor of

4    stipulating to deportation rather than fighting his immigration case for months, if not years, while in

5    custody. Further, his access to counsel will be limited. The non-detained docket in immigration court

6    presents the smallest sliver of a chance for Mr. Garcia Lopez to stay with his mother and siblings, and

7    so that is the defense's priority today.

8                        **COMMENTS TO THE PRESENTENCE REPORT**

9         First: Mr. Garcia Lopez is deeply appreciative of the work, time, and thought that went into his

10   Presentence Report ("PSR"). There are no outstanding objections, but Mr. Garcia Lopez did request

11   additional JSIN data be included in the PSR. Probation complied with the request. PSR at ¶¶ 73-79.

12        The request was based on the idea that the limited data-set initially provided (which is normally

13   provided in PSRs in this District) does not provide a full scope of the JSIN data that is available, data

14   which is extremely important. Specifically: from 2019 to 2023, there were only 112 people,

15   nationwide, whose primary guideline was § 2B3.1, with a criminal history category of I and a final

16   offense level of 22.[1] 12 of those people received substantial assistance departures. 100 did not, and

17   41% received below-Guidelines sentences, nonetheless. Three people received noncustodial

18   sentences.

19        Further, as noted in counsel's comments about the JSIN, which are now part of the PSR, what

20   the JSIN data does not account for (nor can it) is whether any of those 112 people were similarly

21   situated to Mr. Garcia Lopez with regard to his youth, his immigration status, the violence he faces in

22   Mexico, and the possibility of being separated from his family.[2] These factors, as well as the facts

23   that 41% of somewhat similarly-situated individuals received a below-Guidelines sentence, and that

24   Probation is recommending a below-Guidelines sentence of 35 months, animate the defense request

25   

---

26   [1] In contrast, for example, there were 921 similarly situated individuals (Category I, no prior
27   convictions) charged with violations of 18 U.S.C. § 922(g) in the same four-year time frame. 214 of
     those individuals received non-custodial sentences. Of the individuals who received custody time,
     39% received within-range sentences, and 48% received downward departures or variances.
28   [2] It is very possible that many of those individuals were similarly situated in terms of lacking a father
     or father figure in their lives.

SENTENCING MEMORANDUM
*GARCIA LOPEZ*, CR 23–081 JST

for a split sentence in this case.

## BACKGROUND

**I.   Mr. Garcia Lopez's childhood involved moving back and forth between Mexico and the United States to try and stay connected to his father.**

Mr. Garcia Lopez was born in Mexico. His mother and father brought him to the United States, specifically to Pascoe, Washington, before he was one. PSR at ¶ 34. His younger sister Melissa and brother Emanuel were both born in Pascoe, and are both United States citizens.

Until Mr. Garcia Lopez was six, his whole family was together in Pascoe. His father struggled with substance abuse. PSR at ¶ 38. Then, when he was six, his father was arrested in front of him when he came home from school. PSR at ¶ 35. His family returned to Mexico when Mr. Garcia Lopez was eight, because his father was deported. PSR at ¶ 34.

In Mexico, Mr. Garcia Lopez's mother managed her father's grocery store, and eventually took it over, along with her sister, Mr. Garcia Lopez's aunt. Mr. Garcia Lopez played soccer, went to Sunday school, and played with his siblings and cousins. His parents separated when he was sixteen, in part because of his father's drug issues, PSR at ¶ 38, but his mother was able to keep supporting them with the grocery store business. PSR at ¶¶ 35-36. Mr. Garcia Lopez's father dropped off the map in when his parents separated: Mr. Garcia Lopez feels that his dad "let him down" through incarceration, drug use, and then abandoning him. PSR at ¶ 38.

**II.   Mr. Garcia Lopez's family experienced violence and fear in Mexico, including kidnappings and family members disappearing.**

Then, in 2017, when Mr. Garcia Lopez was sixteen, everything changed. Four of his mother's cousins were kidnapped that fall. His uncle, his mother's brother, was also kidnapped. PSR at 36. Those cousins, and that uncle, were working for drug cartels, and the family believes that that they were targeted, and that all members of the family, even those like Mr. Garcia Lopez and his siblings who have nothing to do with it, are in danger. Mr. Garcia Lopez's mother and aunt, terrified for their safety and that of their children, petitioned for asylum, and brought Mr. Garcia Lopez, his two siblings, and his cousins to the United States.

As a part of the asylum petitions, Mr. Garcia Lopez's mother, Leonor Lopez Ruiz, and his aunt, America Cristina Lopez Ruiz, wrote declarations to the immigration court. Sealed Exhibit A, Leonor

Lopez Ruiz's Asylum Documentation; Sealed Exhibit B, Declaration of America Cristina Lopez Ruiz.

Leonor's declaration describes the kidnappings of her cousins, the murder of a worker on their ranch, as well as the kidnapping, at gunpoint, of her brother-in-law, her sister's husband, Mr. Garcia Lopez's uncle. Sealed Exh. A at 4. The declaration describes her fear, threats, and fleeing to the United States. Sealed Exh. A at 4-5. It describes more threats after the family got to the US, including descriptions of torture that Mr. Garcia Lopez's uncle experienced, and threats to the entire Lopez family (additional threats to more cousins, threats to Mr. Garcia Lopez's father, and threats to a family member who was a politician). Sealed Exh. A at 5-6. Leonor believes that her children "will never be safe in Mexico." Sealed Exh. A at 6.

America Cristina's declaration also describes the kidnappings of their cousins, and the death of one of their workers. Sealed Exhibit B at 1. She describes the kidnapping of her husband, Mr. Garcia Lopez's uncle. Sealed Exh. B at 2-3. She describes going into hiding with her children, and fleeing to the United States. Sealed Exh. B at 3. She also learned about more targeting of her family after they left for the United States. Sealed Exh. B at 3-4. She also believes that she and her children "won't be safe in Mexico." Sealed Exh. B at 4. Both asylum petitions are still pending.

III.   **Mr. Garcia Lopez's family fled to the United States for safety, but life was much more difficult for them here.**

Mr. Garcia Lopez's family's life was much harder when they got to the United States. He lived with roommates in Oakland when they came here, trying to be independent, but since this case, lives with his mother, his two siblings, his aunt, her partner, and his cousin: seven people in a three-bedroom home in Stockton. PSR at ¶ 40. His mother is a monolingual Spanish speaker, who went from running her own grocery store to working for a company that makes shower doors, and supporting three kids on her own. She works long hours because the pay is not very good. Mr. Garcia Lopez does not have a relationship with his father, who is in Mexico and still struggling with substance abuse issues. PSR at ¶¶ 37-38. Mr. Garcia Lopez's mother's greatest fear is that Mr. Garcia Lopez will be deported to Mexico, and that he will be targeted, kidnapped, and killed there. PSR at ¶ 37; Exhibit C, Letter from Leonor Lopez Ruiz.

In the United States, Mr. Garcia Lopez got involved with the wrong people. His family fled here when he was 18.[3] He has seen a close friend murdered in a drive-by shooting in Oakland. PSR at ¶ 37. As noted above, Mr. Garcia Lopez was living in Oakland with roommates during the conduct that led to this case and moved back in with his family after his arrest. He has had some struggles on bond but has had absolutely no issues regarding conduct related to the case itself. He made unbelievably poor decisions, but those decisions were not made in a vacuum: they were on par with the incredibly poor decisions being made around him.

This background is incredibly important in evaluating the appropriate sentence in this case. It is not an excuse for Mr. Garcia Lopez's behavior. But Mr. Garcia Lopez's story, his youth, his lack of father or figure, the risk to him in Mexico, and the possibility of being separated from his family, all mitigate in favor of a split sentence in this case.

## SENTENCING RECOMMENDATION

As noted above, because of deportation concerns, the defense's request is for a split sentence. The Guidelines, on which the parties agree, are 41-51 months. Probation is recommending a six-month variance to the Guidelines, and a 35-month sentence. The defense suggestion is for a split sentence of the low-end of the Guidelines, 41 months. Specifically, the recommendation is for 29 months in custody (six months less than Probation's recommendation), and 12 months of home confinement to follow. The important thing, from the defense perspective, is ensuring that there is a sufficient amount of home confinement imposed as part of the underlying sentence that the Bureau of Prisons will release Mr. Garcia Lopez to home confinement, and not send him directly to immigration detention. Again, the most likely outcome here is that Mr. Garcia Lopez will be deported. But any chance, no matter how slim, that Mr. Garcia Lopez has of remaining with his mother and siblings in the United States and avoiding violence in Mexico after this case is dependent on being placed on a non-detained immigration docket. In turn, being on the non-detained docket provides a slim chance of immigration relief. A split sentence, thus, provides a chance at a chance, functionally. The

---

[3] As this Court is well aware, the adolescent brain does not mature until approximately age 25 or 26. Arain M, Haque M, Johal L, Mathur P, Nel W, Rais A, et al. Maturation of the adolescent brain. Neuropsychiatr. Dis. Treat. 2013;9:449, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3621648/ (last accessed May 24, 2024).

defense's position is that that chance at a chance is an incredibly important factor for this Court to consider.

**I.      The behavior here is aberrant, which supports a split sentence.**

The aberrant behavior departure, under U.S.S.G. § 5K2.20, is appropriate when an individual commits a crime "without significant planning," in a "limited duration," and "represents a marked deviation . . . from an otherwise law-abiding life." Here, Mr. Garcia Lopez is twenty-two years old. He has zero criminal history points. He is not eligible for the two-point reduction for a zero-point offender pursuant to U.S.S.G. § 4C1.1 because a gun was brandished during the robbery, though he was not the one who brandished it. The requested reduction for aberrant behavior here is not intended to reduce sentence length, instead, it is requested in support of a split sentence, and would be appropriate because of Mr. Garcia Lopez's youth, his childhood without a father, the violence his family has suffered, his complete lack of criminal history, and the severity of the immigration consequences he faces: separation from his family, and possible exposure to violence in Mexico.

**II.     Under § 3553(a), Mr. Garcia Lopez's youth, immigration status, his mixed status family, and his possible exposure to severe violence in Mexico also support the requested split sentence.**

Like every other person before this Court for sentencing, Mr. Garcia Lopez is "a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996) (quotations omitted)).

As noted above, Mr. Garcia Lopez spent most of his childhood without his father. First his father was deported, and then, even though his mother moved Mr. Garcia Lopez and his siblings back to Mexico to be with him, Mr. Garcia Lopez's father was simply absent. Mr. Garcia Lopez's younger brother, Emanuel, who is sixteen, has also grown up without their father, and Mr. Garcia Lopez has tried to fill that space.

Mr. Garcia Lopez is the one who taught Emanuel how to shave. He is the one who taught Emanuel to play soccer. Mr. Garcia Lopez's main concern, throughout this entire case, has been about the ways in which it impacts his family: the stress it has placed on his mother, the sadness it has inflicted on his siblings, and the anxiety his partner and her children feel about whether or not he will

be able to continue being in their lives. His concerns about being deported away from his family are less for his own sake, and more about the effect it will have on those he loves.

Mr. Garcia Lopez understands that the conduct here is incredibly serious. He is prepared to go to prison. He is prepared to pay for what happened. But what scares him, and what it is impossible to prepare for, is the possibility of being separated from his mother, his little sister, and his little brother by a border that he cannot cross. The fear is animated by concerns over his own safety, of course, but more by concerns about how they will function in his absence. Put simply, Mr. Garcia Lopez is worried that his mother will worry so much about him that she will not be okay, even though she is here in the United States, and safe. Exh. C.

Mr. Garcia Lopez is also scared by the idea that his siblings will be here, alone, growing up without either a father or an older brother. He wants to be able to protect his siblings. He wants to be able to ensure that they do not get into trouble the way that he has. If Mr. Garcia Lopez is deported, he will not be able to ensure that on a day-to-day basis.

**III.   Mr. Garcia Lopez also has concrete goals to move forward, whether that is in the United States or Mexico.**

As noted in the PSR, Mr. Garcia Lopez knows basic animal care, and enjoys working with animals. He has been exploring GED options so that he could, perhaps, pursue a future career as a veterinary technician here in the United States. PSR at ¶ 46. Even if he is deported, Mr. Garcia Lopez still plans to try and work with animals in Mexico, on a ranch his family owns, and to do his best to remain safe from the violence that has affected his uncle and cousins. PSR at ¶¶ 36, 46.

### CONCLUSION

This is an incredibly difficult case. It is an incredibly sad case. And it is a case, in the defense's view, that is about far more than the advisory Guideline range. If deportation were not a concern, the tenor of this sentencing memorandum would be very different. But it is a concern. And it is a concern that necessarily implicates the values that underpin our criminal legal system. The defense's position is that, from a retributive perspective, certain deportation is too harsh a consequence. A custodial sentence is warranted here: the defense does not dispute that. But, in the defense's eyes, certain deportation is too steep a retributive price to pay. The defense's position is that for this specific

young man, deportation is a far harsher consequence than prison, and that that must be taken into account.

Therefore, even if this Court wants to impose Probation's recommendation, or a Guideline custodial sentence, the defense hopes that this Court will consider splitting that sentence. For instance, the Court could impose a 47-month sentence, a mid-range Guidelines sentence, with Probation's request of 35 months in custody with 12 months of home confinement to follow. Or this Court could impose a 51-month sentence, a high end Guidelines sentence, with 39 months in custody (two months less than the low-end) with twelve months of home confinement to follow.

Again, the defense's priority is any hope of avoiding a consequence that is, in the defense view, far more serious than prison: separation of a young man from his mother and sister and brother, and exposing him to the possibly of serious violence in another country.

Dated:     May 24, 2024                          Respectfully submitted,

                                                 JODI LINKER
                                                 Federal Public Defender
                                                 Northern District of California

                                                            /S
                                                 SAMANTHA JAFFE
                                                 Assistant Federal Public Defender

# EXHIBIT A

## FILED UNDER SEAL

# EXHIBIT B

## FILED UNDER SEAL

# EXHIBIT C

I, Leonor Lopez Ruiz

Mother of the defendant would like to ask the court to do us the favor of giving him a chance I believe that even if he made a mistake he is not a bad person it should not be overlooked that he has been a good son, a good brother and we have gone through many things that I think have affected him he is a good person, it would affect us if they sent him to Mexico because I know he would have serious consequences since, as you know, we are here for asylum because we are in danger, as I say, I know he made a mistake but I hope you give him a chance to make amends. I think he would know how to take advantage of it. If they send him to Mexico I think it will affect my entire family, first and foremost me due to health problems.

Without further thanks

Leonor Lopez R.

Translated by: Victor Daniel Lopez Pulido, Interpreter, Office of the Federal Public Defender for the Northern District of CA.